The bill prays a decree that a certain release and cancellation of a lease from complainants to Huyler's for premises at 861 Broad street, Newark, New Jersey, "was obtained by fraud and that it be * * * declared null and void and delivered up for cancellation and that the defendants Huyler's are bound under said lease to the same extent as though said release had not been executed and delivered."
On January 5th, 1926, complainants made a written lease with Huyler's for the premises mentioned for a period of ten *Page 353 
years and three months from February 1st, 1926, to May 1st, 1936, with an option to the lessee for an additional ten years at increased rentals therein specified. Huyler's agreed to pay rent at the rate of $15,000 per annum from February 1st, 1926, to May 1st, 1929; $18,000 per annum from May 1st, 1929, to May 1st, 1934, and $20,000 per annum from May 1st, 1934, to May 1st, 1936; and, in addition thereto, Huyler's also agreed to pay as part of the rent of said premises, all taxes and fire, plate glass and public liability insurance. In November, 1932, the lease was modified to provide the payment of rent at the rate of $15,000 per annum, plus taxes and insurance and plus a certain percentage of the gross sales. In June, 1933, the rent was further reduced to $14,350 per annum, plus taxes, c. At that time the performance of the lessee's obligations under the lease were guaranteed by Huyler's of Delaware, Incorporated. Both Huyler's of New York and Huyler's of Delaware are controlled by the defendant D.A. Schulte, Incorporated. In October, 1933, an attempt was made, on behalf of the lessee, to obtain a cancellation of the lease, and negotiations to that end were carried on between the parties for some time, but failed as the lessee was unwilling to meet the terms of the lessors. After these negotiations terminated a plan was devised by Huyler's, or in its behalf, by which it was determined to procure a cancellation of the lease through the medium of a purchase of the property by a corporation to be formed for that particular purpose and no other. While the negotiations for the purchase of the property were instituted and carried on by the Schulte organization they were in fact the acts of Huyler's, the lessee, which company furnished the money to consummate the proposed transaction. The services of the defendant Houston, a real estate broker in Newark, were enlisted by Huyler's through Schulte for the purpose of negotiating with the complainants for the purchase of the leased premises and Houston was cautioned not to disclose the identity of the proposed purchaser. Pursuant to these negotiations an agreement was finally entered into between the complainants, the lessors, and New Dorp Realty Company, a corporation formed for that purpose and financed by Huyler's, under the terms of *Page 354 
which the complainants agreed to sell and the New Dorp Realty Company agreed to buy the leased premises for the sum of $180,000 payable $7,500 upon the execution of the contract; $12,500 upon settlement fixed for January 15th, 1934; $130,000 by the vendee taking the premises subject to a first mortgage held by the United States Savings Bank of Newark, and $30,000 by a second mortgage in that sum for three years at five and one-half per cent. This agreement was dated December 26th, 1933, and among other provisions which it contained was one to the effect that the vendor might deliver the premises either with or without the Huyler lease. During the negotiations, on inquiry by the complainant, Houston refused to disclose the identity of his principals (he did not know that Huyler's was the real principal) but explained to complainants that they were financially responsible, and upon this representation complainants had a right to and did, in fact, rely. The purchase price fixed by the agreement of sale was a compromise figure fixed only when complainants learned that the purchaser was willing to accept the premises free of the Huyler lease. Before the contract was finally closed complainants renewed negotiations with Huyler's for cancellation of its lease and Huyler's agreed to pay complainants $10,000 for the surrender of that lease. Settlement of this transaction with Huyler's and the execution of the agreement for the sale of the leased premises to the New Dorp Realty Company were fixed at the office of Mr. Mulligan, one of complainants, at the same hour; and at the appointed time the representative of Huyler's and a representative of the vendee came to Mulligan's office, the one bringing a check for $10,000 for the cancellation of the lease and the other a check for $7,500 as deposit upon the purchase price pursuant to the terms of the agreement of sale. Both of these representatives came directly to Newark from the office of Huyler's in New York and the funds which they both carried were furnished by Huyler's. The complainants were ignorant of the fact that both of these gentlemen represented Huyler's and when they arrived Mr. Mulligan closeted them in separated rooms in his office, concealing(?) from one the presence of the other. The contract *Page 355 
of sale was executed; the deposit of $7,500 made, the agreement for cancellation of the lease was executed and the $10,000 consideration therefor paid practically simultaneously. A few days before January 15th, 1934, the day fixed for settlement under the contract of sale, complainants were notified that the purchaser was unable to complete its contract. Huyler's having obtained for $17,500 what it started out to pay $20,000 for, the New Dorp Realty Company, its dummy, refused to carry out its contract of purchase.
At the time the negotiations for the purchase of the leased premises were instituted by Huyler's it was the intention of that company to carry out its purchasing contract to the extent of taking title; to then cancel its lease and abandon the property. The subsequent negotiations instituted by Mulligan with Huyler's for the cancellation of the lease resulted in a modification of this intention as Huyler's then saw that it could obtain for $17,500 that for which it had proposed to pay $20,000; and at the time of the cancellation of the lease and the payment of the deposit on the contract of sale, Huyler's had no intention of going beyond the point in the proposed transaction at which the prime object of its negotiations, the cancellation of its lease, was attained. This fact, and the fact that the New Dorp Realty Company and Huyler's were one and the same, and that all of the negotiations touching the purchase and sale of the premises and the cancellation of the lease were being actually carried on with Huyler's as the real principal, were concealed from the complainants. This, it is contended on behalf of the complainant, stamps the whole transaction as fraudulent and entitles them to a cancellation of the release of the lease thus obtained by Huyler's.
It was testified by defendants' witnesses that at the time the contract of purchase was executed on behalf of the proposed purchaser, there was no intent to take title. The execution of that contract was the inducement for complainants' execution of the release from the lease. A contractual promise made with the undisclosed intention not to perform it is a fraud. Roberts v.James, 83 N.J. Law 492; Zuckerman v. Geller, 103 N.J. Eq. 145;Restatement of Contracts § 473. *Page 356 
And it is fraud where at the time of making the promise, the promisor's intention to perform was dependent upon contingencies known to the promisor and unknown to the promisee. Gordon v.Schellhorn, 95 N.J. Eq. 563; Wilkinson v. Wildwood StrandRealty Co., 115 N.J. Eq. 373. As above indicated, when the negotiations for purchase were instituted, Huyler's intended to complete the purchase only if that was necessary to effect a cancellation of the lease.
But it is claimed that, as the complainants were willing to sell their property upon the terms agreed upon, knowing full well that the purchaser, the New Dorp Realty Company, was financially irresponsible, and that after settlement that corporation could do as it pleased with the property and could cancel Huyler's lease; and that as, in such event, complainants would have nothing except the $20,000 cash, the right to foreclose the second mortgage, and a possible deficiency claim against a financially irresponsible bondsman, they have no right to now complain that the transaction fell through with a loss of $2,500 from what they had originally expected; and, it is claimed, especially so as this resulted entirely from the acts of the complainants themselves in renewing negotiations for the cancellation of the lease. But this contention overlooks the fact that it was represented to complainants that the purchaser's undisclosed principals were parties of financial responsibility. And notwithstanding the fact that complainants knew a corporation was to be formed for the sole purpose of taking title to the property, they had a right to assume, as they did assume, that the proposed transaction was a bona fide one, and that no purchaser would pay $20,000 in cash on the purchase price of a property of this character and then immediately abandon it. In other words, complainants had a right to assume that they were dealing with a real and not a dummy purchaser; that they were making a real and not a pretended sale. Deceit lies at the foundation of all fraud and may be said to be its cornerstone. The proposed transaction of purchase of complainant's property by Huyler's was conceived in fraud and executed in fraud. It was not intended as a bona fide transaction but was designed to obtain for Huyler's indirectly and by fraud, that which *Page 357 
could not be obtained directly. Had the purpose of the proposed transaction been disclosed to complainants they would have scorned the approach. That complainants themselves obtained the cancellation of the lease with Huyler's, the very object of that company's fraudulent scheme, does not bar them from relief here, as under the terms of the contract of sale complainants had a legal right to do exactly what they did do. No doubt Huyler's was, figuratively speaking, laughing in its sleeve at complainants' efforts to attain the very object of its own manipulations; but the difference in the position of the parties is that complainants were exercising a reserved legal right, while Huyler's was doing that which no man has a right to do — perpetrating a fraud, and by deceit and subterfuge attempting to obtain from complainants that which it knew it could not obtain by fair and open dealing. The subtle acquiescence of Huyler's to the inclusion in the contract of the provision for the purchase of the premises "with or without the lease" was but an act of trickery, the very object of which was to induce complainant to reopen negotiations for the cancellation of a lease which had become burdensome. The fact that it worked to such a degree of perfection affords no basis for withholding from complainants the relief to which they obviously would have been entitled had the final proposition for cancellation come from Huyler's. The absolute perfection of the plan merely serves to demonstrate how complete in its conception was the entire scheme. That it was successful does not alter the character or the effect of the fraud. And when a case of fraud is established a court of equity will set aside all transactions founded upon it by whatever machinery they may have been effected and notwithstanding any contrivance by which it may have been attempted to protect them.Kerr Fr. 43, 44; Turner v. Kuehnle, 70 N.J. Eq. 61.
In Olson v. Pettibone, 168 Minn. 414; 210 N.W. Rep. 149,
the defendant, a competitor of the plaintiff, desired to acquire the latter's property. Being unable to buy from Olson, he devised a scheme similar to that employed by Huyler's. He procured a real estate broker to approach Olson and represent to him that he had a prospect for the purchase *Page 358 
of his property. The broker produced one Flatt as the prospect and represented him to be financially responsible. Olson agreed to pay the broker's commission and a contract of sale was entered into, containing a provision that the seller would not engage in the same business in that area for a period of five years. Upon discovering that Pettibone was the real purchaser, Olson sued to rescind the contract. In affirming the overruling of a demurrer to the complaint, the Minnesota supreme court said that "as a matter of public policy, it is generally held that a deal conducted wholly or in part by an agent of one of the parties who at the same time acted for the opposite party may be rescinded by the one ignorant of the double employment without showing any injury or intent to deceive. Rescission is his absolute right.Especially should this principle be applied when, as here,relief is claimed against the instigator of the double agency whodevised it for the very purpose of deceiving a complainant toenter a contract which such instigator knew could not have beeninduced but for the subterfuge to which he resorted." (Italics mine.)
It hardly seems necessary to repeat that the agreement here involved would not have been executed had complainants known that Houston, the broker, was in fact acting for Huyler's (though perhaps innocently as far as he was concerned); and that Huyler's knew the lease could not have been canceled but for the subterfuge employed.
As to the defendant Houston, the bill was dismissed at the final hearing as his part in the fraudulent transaction was apparently innocent. Huyler's will be held accountable for the commissions which Houston received.
I will advise a decree in accordance with these conclusions. *Page 359